RECEIVED
NOV 19 2026
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

FILED
NOV 19 2026
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

**JURY TRIAL DEMANDED**

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MISSOURI**

BRIT FINNEGAN,

Plaintiff,

v. Case No. 4:26-cv-01994-JSD

NOMAD ECOMMERCE, INC., and

ROBERT F. O'BRIEN, individually,

Defendants.

**COMPLAINT FOR EMPLOYMENT DISCRIMINATION**

## I. THE PARTIES TO THIS COMPLAINT

### A. The Plaintiff

Name: Brit Finnegan

Address: 5445 Reber Pl, Saint Louis, MO 63139

County: City of St. Louis (an independent city, not part of any Missouri county)

Telephone: 618.410.9201

Email: brit.finnegan@gmail.com

### B. The Defendants

Defendant No. 1:

Name: Nomad eCommerce, Inc.

Principal address: 1000 Spyglass Lane, Naples, FL 34102

Mailing / operating address: 121 Linden Ave, Saint Louis, MO 63105

Registered agent: Robert O'Brien, 1000 Spyglass Lane, Naples, FL 34102

Defendant No. 2:

Name: Robert F. O'Brien, individually (named as a defendant only on Count II — piercing the corporate veil / alter ego liability, through which O'Brien may be held personally liable for any judgment entered against Nomad eCommerce, Inc. on Count I or Count III; O'Brien is not separately named as a defendant on Count I or Count III)

Address for service: 121 Linden Ave, Saint Louis, Missouri 63105

## II. BASIS FOR JURISDICTION

This action arises under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101–12117 ("ADA"). Jurisdiction is conferred by 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 12117(a) (incorporating the enforcement procedures of 42 U.S.C. § 2000e-5).

This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the state-law alter-ego claim against Defendant O'Brien (Count II) and the state-law whistleblower-retaliation claim against Defendant Nomad eCommerce, Inc. (Count III), as both arise from the same case or controversy as the federal claim in Count I.

Venue: Proper in the Eastern District of Missouri under 28 U.S.C. § 1391(b) — the unlawful employment practice (termination) occurred in St. Louis, Missouri, and Defendant's operating address and employment records are located there.

## III. STATEMENT OF CLAIM

### COUNT I — AMERICANS WITH DISABILITIES ACT: DISCRIMINATION, FAILURE TO ACCOMMODATE, RETALIATION

**(Against Defendant Nomad eCommerce, Inc.)**

A. Basis for the discrimination claim: Disability — actual disability, record of disability, and/or being regarded as disabled.

B. Plaintiff's disability: Posttraumatic Stress Disorder (PTSD) and Major Depressive Disorder (MDD), with an 80% service-connected disability rating by the U.S. Department of Veterans Affairs (Exhibit I).

C. Date(s) of the discriminatory acts: October 20, 2025 (termination), and the period immediately before and after.

D. The conduct complained of:

☒ Termination of employment

☒ Failure to accommodate / retaliation for use of an existing accommodation

☒ Retaliation

**E. Facts:**

1. Plaintiff was employed by Defendant for approximately 17 years, beginning as a front-end developer in 2008 and promoted to Vice President on January 16, 2025.

2. In connection with the promotion described in Paragraph 1 above, President Bates verbally represented to Plaintiff that a replacement for Plaintiff's prior role would be hired within four to five weeks, by late February 2025, so that Plaintiff's dual responsibility for both positions would be temporary. Defendant did not begin recruiting for the position until late March 2025. Bates assigned the recruiting process jointly to Plaintiff and HR/Accounting Director Becky Whisler: Plaintiff drafted the job posting, Whisler posted it and screened applicants, Plaintiff and Whisler reviewed applicants together, and Plaintiff conducted candidate interviews. For the following fifteen weeks, from January 16 to May 1, 2025, Plaintiff performed the full duties of both the Vice President role and the Lead Front-End Engineer role simultaneously, continuing to carry the same full front-end engineering workload he had carried before the promotion, while continuing to direct Vice President-level operations—a combination of roles and tasks that commonly resulted in 60- to 80-hour workweeks. Following the May 1, 2025 hire of Plaintiff's replacement, August Stobbs, Plaintiff spent an additional thirty days training Stobbs on Defendant's codebase, followed by several additional weeks to months of continued supervision.

3. Plaintiff is an 80% service-connected disabled combat veteran with PTSD and Major Depressive Disorder, with his PTSD/MDD disability rated service-connected by the U.S. Department of Veterans Affairs effective April 30, 2010 (Exhibit I). Plaintiff's own VA treatment records document VA care beginning at least as early as January 2007—more than three years before that effective date—and, per Plaintiff's own account, his VA care for these conditions specifically predates the effective date as well.

4. Since at least April 30, 2010—the effective date of the VA disability rating described in Paragraph 3 above, and more than three years before Michael Bates was hired by Defendant—Plaintiff used two self-implemented accommodations to manage his PTSD: dimmed lighting and noise-cancelling headphones. Defendant's own EEOC Position Statement, submitted June 4, 2026, confirms these accommodations "were in place for several years."

5. Defendant had notice of Plaintiff's disability through multiple, independent channels before termination: 2011 and 2012 corporate emails to then-President Torre Tribout, cc'd to two other employees, Brian Rain and Prajwal Devkota, giving explicit written notice of a "PTSD Appointment" at "VA, Jefferson Barracks" (Exhibit G.5); a company calendar displaying recurring "VA Appointment" entries in 2022, 2023, and 2024; a September 18, 2025 text exchange, that evening, in which President Bates told Plaintiff, without naming the medication, that he had started taking something new, describing himself as having become "a member of club K"—a phrase Plaintiff understood to mean Bates had joined the same medication "club" Plaintiff himself was in, and which Plaintiff understood, from his own VA prescription history, to refer to Klonopin, the same medication Plaintiff had been prescribed by the VA from 2004 to 2015 for his panic and post-traumatic stress disorder. This exchange followed a panic-attack episode that began less than two hours after Bates attended a web meeting titled "Nomad Financials" with Owner Robert F. O'Brien, O'Brien's two sons, and Lindsey Luczkowski that same morning, described further in Paragraph 43 below, and a subsequent hospitalization in Las Vegas that Bates told Plaintiff he initially believed was a cardiac event but that the treating physician determined was a panic attack. Neither Bates nor Plaintiff named the medication or the underlying condition at any point in that exchange; Plaintiff nonetheless responded, "Nice! It is effective medication," "It's great for not giving a fuck," and "It helped me sleep," and, when

Bates stated he had been given only five pills, joked, "You need to go to the VA / 90 pills for 30 days"—a joking reference, drawn from Plaintiff's own VA prescription history, to the substantially higher dosage typically prescribed to veterans being treated for PTSD. Bates is not a veteran and, at the time of this exchange, had no access to VA medical care; a September 19, 2025 conversation between Plaintiff and HR Director Becky Whisler regarding Plaintiff's history of panic attacks; an April 15, 2025 in-person conversation in which Plaintiff discussed his combat service, PTSD, and depression directly with Owner Robert F. O'Brien; and a May 14, 2025 phone call in which O'Brien separately contacted Plaintiff directly to seek his guidance on VA disability benefits on behalf of another veteran—a request that itself depended on O'Brien's own knowledge of Plaintiff's status as a VA-rated disabled veteran, followed by a May 20, 2025 email in which Plaintiff provided O'Brien a written summary of the VA's second-opinion request process for that veteran's use, to which O'Brien replied on May 28, 2025 that the veteran had obtained a non-VA appointment as a result (Exhibit L). These examples are illustrative rather than exhaustive: Plaintiff estimates that approximately thirty additional written communications of the same kind—referencing his VA care, his combat service, or his PTSD/MDD treatment—exist within Defendant's own email and messaging systems, to which Plaintiff, since his termination, no longer has access.

6. In the months preceding termination, Bates made the following statements, each confirmed verbatim against the recorded source: on June 18, 2025, during an internal client-and-operations review, Bates stated, "our team is full retard sometimes"; on June 19, 2025, during a company-wide meeting, Bates stated, "Basically our job is we have to convert full retard to high functioning autism"—as a respective criticism of Nomad's clients and Nomad's developers; on July 11, 2025, during a weekly leadership meeting, Bates described a work delay by stating it

"took two months to do a thing that took Hector, who was like the little cerebral palsy boy that could run a marathon"; and on July 23, 2025, during an executive sync, Bates, speaking about Nomad's engineering staff, stated, "That's what I mean by malicious retardation," and separately stated, unprompted, "You know, August, Hector, Andrew are somewhere on the spectrum."

7. On July 10, 2025, in a one-on-one conversation, Director of Customer Success Tina Hartshorn told Plaintiff, "You're not going to, you better, you know, stop working so late. Otherwise your wife's going to leave you... Listen, even if you got a raise, you divide it by your hours, you're actually probably negative"—a reference to the overdue raises described in Paragraph 42 below, which Plaintiff and Hartshorn had discussed in the context of the extended hours Plaintiff was working to meet the EOS performance goals tied to those raises.

8. On July 15, 2025, during a one-on-one meeting with Bates, Plaintiff discussed the terminal decline of his family dog, Heike, then approximately sixteen years old, including her diminished quality of life and his own consideration of end-of-life care for her—a conversation that took place three days before Heike's death on July 18, 2025. Bates responded, among other things, that "16 years is a great run for a dog," that "it's got to be painful and just not comfortable," and compared the decision to one facing a person with a terminal medical condition. In that same conversation, describing his own grieving process, Plaintiff told Bates, "I think I've dealt with it already... it comes in waves"—a process that, in fact, had been ongoing for several months, and that followed the death of the family's other dog, Buckley, approximately fourteen years old, the year before, in 2024, a loss Plaintiff had likewise not yet fully processed. In the days following Heike's death, Plaintiff contracted COVID-19. On August 4, 2025, in a group text message with Owner Robert O'Brien and Bates, Plaintiff described the illness as having "hit [Plaintiff and his wife] hard," lasting "nearly two weeks," with "[t]en of those days... rough." Neither O'Brien nor

Bates raised any performance concern in that exchange, or at any point in the text thread spanning months during this period.

9. On August 5, 2025, during a recorded videoconference with Defendant's client Accutome, a Halma company, attended by President Bates, Plaintiff, Director of Engineering Robert Turner, and several Accutome representatives, Bates told the client Defendant had "about 450 customers"—a figure Plaintiff's own role overseeing client relationships placed at approximately 120. In that same meeting, Bates assigned Plaintiff an unplanned, approximately 500-hour task to rewrite platform-dependent code reliant on an outdated version of the jQuery JavaScript library (version 1.8.3) across Defendant's client sites, a vulnerability the Accutome representative had already raised as a serious concern. When that representative asked Bates to rate the risk of leaving the vulnerability unaddressed, Bates responded, "To me, it's a zero," and separately stated he viewed the risk "to be near zero." When the same representative asked why the project had remained unresolved for an extended period, Bates—a Nomad employee since approximately 2013—responded, "I've not really been very involved... I often am left in the basement here, so I don't know exactly what transpired," and assigned responsibility for providing Accutome's weekly status updates to Plaintiff and Turner.

10. On September 12, 2025, five weeks before termination, Bates told Nomad's leadership team that ownership viewed Bates and Plaintiff as "very effective leaders... that's why we get all the rocks [quarterly goals] done." Bates was out of the office for the majority of the two weeks following a September 18, 2025 panic-attack episode, described in Paragraph 5 above; during that period, Plaintiff performed a portion of Bates's duties in addition to his own, consistent with the dual-role pattern described in Paragraph 2 above, while spearheading the jQuery remediation work described in Paragraph 9 above. On September 26, 2025, three weeks before termination,

in Bates's first meeting with Nomad's leadership team since that panic-attack episode, and in the same recorded meeting in which Bates stated he did not want anyone "having... heart attacks or panic attacks," Bates directed that Plaintiff be brought in to resolve a backlog of operational problems, stating Plaintiff "will de-fuck the situation," and separately told leadership the company was "hitting goals... I think we're going to get to three million this year," while delegating increased crisis authority to Plaintiff by routing further escalations through him and asking him to "embed" with the implementation team. In that same September 26, 2025 meeting, Bates stated, "And if it's people that have PTSD from bad... Shipping modules, uh, maybe we can give 'em some mushrooms."

11. In that same September 26, 2025 meeting, Bates stated, "I have set a really bad example, and I need to apologize for that... I have gone Kamikaze style. Full tilt, full speed, no sleep... We gotta get everything done right the fuck now... applying pressure and applying pressure and applying pressure and applying pressure." Bates told Plaintiff directly that he had "been staying up way too fucking much and doing way too many long fucking hours," and told Nomad's leadership, "Put yourselves first. This company will survive... if this company doesn't work and things explode, it's not because we failed... we're doing an impossible task here."

12. On September 29, 2025, during that week's L10 leadership meeting, Director of Engineering Robert Turner reported on the status of the jQuery remediation project described in Paragraph 9 above, stating, "the jQuery piece was actually alright, kind of a larger lift... but Brit helped a lot with that as well. Appreciate that." Plaintiff resolved the vulnerability described in Paragraph 9 above by building an AI context library from Defendant's own codebase and using it to identify and rewrite each instance of jQuery-dependent code with equivalent pure JavaScript, replacing the outdated jQuery 1.8.3 library that Defendant's storefronts had depended on since the

platform's 2013 release, before this work. Turner and another developer then implemented Plaintiff's code into Defendant's core platform as a feature that could be toggled on or off for each individual client storefront. Plaintiff alone provided Accutome's weekly status updates described in Paragraph 9 above, to avoid diverting Turner's attention from Nomad's overwhelmed, understaffed three-man core development team, one of whose members had less than a year of experience at the company. On June 19, 2025, during a company-wide meeting, Plaintiff presented a custom AI tool he had built from Defendant's own codebase and database structure, which he named "Nomad Guru," and instructed Defendant's broader staff—including engineering, support, and account management personnel—on its use; Bates responded that the tool would become "a central gem that we all update that is like the master of the master of the master." On July 14, 2025, during that week's leadership meeting, Plaintiff presented a separate AI-driven feature he had developed in direct response to a customer-reported issue, which Bates stated "would be cool on the platform because none of our competitors are doing that," and separately estimated that the AI features then in development would "increase the AR by about 300 grand just on the current customer base." In that same meeting, Bates assigned Plaintiff responsibility for "AI Adoption" training for three named staff members—Hector Wong, August Stobbs, and Andrew Metzger—with a July 25, 2025 deadline.

13. Defendant's EEOC Position Statement, submitted June 4, 2026, states that Plaintiff "focused a disproportionate amount of his time on building artificial intelligence automations and tools that were not useful to the business," and that this "caused Mr. Finnegan to rely heavily on others to perform his work." The artificial-intelligence work the Position Statement describes is the same work described in Paragraph 12 above, including the features Bates himself stated, at the time, "would be cool on the platform because none of our competitors are doing that," and

separately estimated would "increase the AR by about 300 grand just on the current customer base."

14. On October 10, 2025, Plaintiff was present for a recorded accounting meeting in which O'Brien Capital Executive Business Partner Lindsey Luczkowski told Bates that a related-party debt exceeding $7,000,000, owed by Defendant to O'Brien Capital LLC, had not yet been "papered over," and that she would complete that documentation before the end of 2025, backdated to February 2025 for Bates's signature—the same month in which Defendant O'Brien completed his acquisition of control over Nomad eCommerce, Inc.—eight to ten months before the date the documentation would actually be prepared and signed. President Bates responded, "Okay"—agreeing to sign the proposed backdated documentation.

15. Also during that October 10, 2025 call, O'Brien Capital Executive Business Partner Lindsey Luczkowski asked Plaintiff how he was doing after several weeks of covering both his own role and Bates's duties, describing the question as her "team pulse on Brit." Plaintiff responded, "Burned out, but I'm fighting it"—after covering Bates's duties while he recovered from the September 18, 2025 panic-attack episode described in Paragraph 5 above, and working excessive hours to complete the approximately 500-hour task Bates had committed to Accutome in August 2025, described in Paragraph 9 above, to keep Nomad's understaffed core development team on track. Bates responded directly to Plaintiff, in front of Nomad's leadership team, asking, "Is there anything I can take off your plate to keep you from exploding?"—a question that itself acknowledged Plaintiff's workload had reached a breaking point, though Bates did not identify, and Defendant never since has identified, any task actually removed from Plaintiff's responsibilities as a result. Luczkowski observed that Bates had experienced the same pattern first, stating, "obviously Michael was first and now you're second," and separately raised

whether Nomad needed additional staff. Bates—who is approximately fifteen years younger than Plaintiff—responded, "I prefer or I have the youngest heart, so I dodged a heart attack and I don't want anyone else getting one," then, "Yeah, or if we need better staff," and stated the company was "trying to get in front of it... to avoid any crash outs." Luczkowski suggested Plaintiff "take a mental health day." This conversation occurred three days before Bates directed Plaintiff to take leave, as alleged in Paragraph 18 below, and ten days before Plaintiff's termination—additional notice, before an O'Brien Capital LLC executive, of the workplace strain Plaintiff was experiencing in the weeks immediately preceding his termination.

16. On October 13, 2025, during that day's recorded weekly leadership meeting ("L10"), in the opening minutes, immediately after HR Director Becky Whisler began sharing Defendant's EOS Control Panel with the group, Plaintiff winced, audibly reacted with "Agh.," and stated, "This meeting gets me every time because of how bright and white the control panel is. It's like blowing out the eyes too early"—despite having already dimmed his own lighting and monitor in anticipation of the Control Panel's brightness, consistent with the accommodation described in Paragraph 4 above, which prevents the anxiety, loss of focus, and dissociation that prolonged exposure to bright light otherwise causes him. Bates responded, "I think they have a dark mode. It hurts my eyes too." Plaintiff said he would "sneak that into the settings for Becky," and when Whisler apologized, Plaintiff told her, "It's not your fault. It's a Michael and I preference thing." Plaintiff was first included in these weekly L10 meetings in January 2025, upon his promotion to Vice President; Owner Robert O'Brien had attended the L10 since Defendant began its EOS practice in approximately 2022. Plaintiff dimmed his lighting for nearly every meeting, including the L10, throughout the roughly ten months between his inclusion in the L10 and this meeting, without O'Brien or anyone else raising it as an issue. Later in that same meeting, O'Brien stated

to Bates, “I want to give a shout out to the new Michael Bates... I think it's going to improve your leadership... wish I had a glass of wine to toast you right now”—a toast Plaintiff understood to reference Bates's recent decision to take leave and rest, following the panic attack described in Paragraph 10 above. Also during that same recorded meeting, Plaintiff warned Nomad's Directors to be mindful of burnout and exhaustion from overwork, noting that he normally worked roughly 16 hours each weekend and had not worked the preceding weekend. Defendant's own later written account of this same meeting does not merely differ from Plaintiff's recollection — it states the inverse of what the recording itself shows, as addressed in Paragraph 50 below. Hartshorn, observing Plaintiff shake his head at Bates's forthcoming offer, told him, “He's telling you why don't you take two days off.” Luczkowski, referencing Plaintiff's comment about not having worked that one weekend, remarked, “Brit's like, I did, Saturday and Sunday”—underscoring that Plaintiff's habitual pattern was to work through weekends, such that even a single weekend off was itself notable to his colleagues. Bates responded by suggesting Plaintiff personally take a couple of days off, stating, “I don't want you to have a heart attack on the plane”—a reference both to Plaintiff's upcoming business travel the following month and to the same panic-attack-related leave O'Brien had just toasted earlier in this same meeting.

17. Minutes before that same October 13, 2025 L10 meeting, described in Paragraph 16 above, concluded, Bates stated, regarding Nomad's software developers, “They sit there and sit there and sit there and sit there and they agonize over the journey. And then, you know, unfortunately, we kind of feed into that dysfunction—a dysfunction that was itself a symptom of an understaffed team—because when they don't make the journey, Brit and I come in with a helicopter and carry them to the mountaintops.” Hartshorn responded, “Yeah. And sit with them while they do their work.” Bates then told Whisler, “Give it to Brit, and Brit will be the shot

caller there. I'll just be the top guy"—"shot caller" meaning responsibility for whether the team needed to change a process or change the employees performing it, under Nomad's EOS management principles—assigning Plaintiff, not himself, day-to-day responsibility for diagnosing the root cause and the best solution to prevent the recurring need for Plaintiff and Bates to rescue the team's failures.

18. On October 13, 2025—the same day described in Paragraph 16 above—Plaintiff separately raised questions about the debt described in Paragraph 14 above with Bates in an unrecorded, impromptu call beginning at approximately 10:10 a.m., shortly before that day's L10, which Nomad's own calendar record confirms the L10 was scheduled for 10:30 a.m. The recording of that L10 meeting runs 41 minutes and 30 seconds, placing its conclusion at approximately 11:11 a.m. Approximately 10 to 15 minutes later, between 11:21 and 11:26 a.m., Bates messaged Plaintiff directing him to take the remainder of that week off. Plaintiff pushed back, citing a priority project requiring his attention. Per Plaintiff's contemporaneous notes made the same day, Bates responded, "What if I told you that you don't have a choice?" Bates and Plaintiff ultimately agreed Plaintiff would take October 15 through 17, 2025 off instead of the full week. This places the directive to take leave at approximately 76 minutes after Plaintiff's impromptu debt inquiry, and within the same L10 in which Plaintiff had just been assigned day-to-day responsibility for the team's rescues, described in Paragraph 17 above.

19. Plaintiff was terminated seven days later, on October 20, 2025, at the meeting described in Paragraph 21 below.

20. The related-party debt discussed on October 10, 2025—a debt exceeding $7,000,000—was more than double the approximately $3,000,000 in 2025 annual recurring revenue Bates projected to leadership on September 26, 2025 (Paragraph 10 above), at a company that

employed approximately 20 people at the time. At no point at the time of the administrative leave or the termination did Defendant cite the October 10 debt discussion, Plaintiff's October 13 questions about it, or Plaintiff's performance, as a reason for either action. Not until 43 days later did Defendant, for the first time, cite Plaintiff's performance—stating it had been "severely deficient"—as a reason for the termination; neither then nor at any other time did Defendant reference the October 10 debt discussion or Plaintiff's October 13 questions about it. During the October 13, 2025 impromptu call described in Paragraph 18 above, Bates told Plaintiff not to raise the debt at that day's L10, stating leadership would be informed of it the coming Friday, October 17, 2025. Consistent with that instruction, the debt is not mentioned at any point in the recording of the October 13, 2025 L10 described in Paragraph 16 above. Plaintiff was not present at the Friday meeting Bates referenced: he was on the leave Bates had directed him to take on October 13, 2025, covering October 15 through 17, 2025, as described in Paragraph 18 above. In its June 4, 2026 Position Statement to the EEOC, Defendant went further still, stating that "Mr. Finnegan did not inquire into Nomad's accounting practices"—a position contradicted by the October 10, 2025 accounting call described in Paragraph 14 above (regarding the $7,000,000 related-party debt), which Plaintiff attended, and by Plaintiff's October 13, 2025 questions about that same debt, described in Paragraph 18 above.

21. On October 19, 2025, Bates invited Plaintiff to meet the next morning at Mountain House Cafe, a coffee shop two blocks from Plaintiff's home that Plaintiff had previously used for remote work meetings. The invitation did not raise any concern for Plaintiff, who understood it as a chance to catch up in person on what he had missed during the leave described in Paragraph 18 above. On October 20, 2025—the day Plaintiff returned to work—Bates met with Plaintiff at

Mountain House Cafe in St. Louis, Missouri, from approximately 8:37 a.m. to 10:06 a.m. Bates terminated Plaintiff's employment at this 89-minute meeting.

22. Bates initially gave only a vague reason: that Owner Robert O'Brien "wanted to go in another direction." When Plaintiff asked what direction, and why no such change had been communicated before that morning, Bates stated that, "from O'Brien's eyes," Plaintiff had failed at three specific projects—the first time in Plaintiff's 17-year tenure that any Nomad representative had communicated a performance concern to him directly. Plaintiff identified that the specific tasks Bates attributed to him on each project had actually been assigned to Nomad's Directors and team members, not to Plaintiff, and told Bates as much. This is substantiated by contemporaneous recordings: as to the billing-system ("Ignition") rollout, Bates himself stated, "This was a good move because I've never seen our AR this low as a company ever" (Exhibit P) —the opposite of a mismanaged conversion; as to the April 22, 2025 cloud-services outage, Plaintiff was the sole executive who responded: he texted Bates at 6:48 a.m. ("All sites are down"—unanswered) (Exhibit H.1), placed two follow-up calls to Bates at 7:06 a.m. and 7:28 a.m., neither of which was answered (Exhibit H.2), and, after Owner O'Brien texted him directly at 7:25 a.m. asking, "Nomad is down?," briefed O'Brien at 7:28 a.m.: "Yes, Robert and I are investigating. We elevated to tierpoint. Robert is speaking with them. I'm troubleshooting in cloudflare" (Exhibit H.3); and as to the engineering backlog, Director Hartshorn attributed the delay to sales commitments made without the underlying integrations ("We didn't even have an integration with Infor and we're selling it"—Exhibit Q) and to Bates's own undocumented work ("Part of the problem is Bates and the work that he does... it's never documented"—Exhibit R).

23. At that point, Bates stated that O'Brien "hated [Plaintiff's] dim lighting" and "thought [Plaintiff] looked fucking depressing"—a direct reference to Plaintiff's PTSD accommodation.

Bates continued, telling Plaintiff that O'Brien had lost his temper in a phone call with Bates following the October 13, 2025 L10 described in Paragraph 16 above, during which O'Brien pressed Bates to terminate Plaintiff's employment while voicing the same complaint about Plaintiff's lighting—notwithstanding that, in that same L10—a web meeting each of them attended from his own home office—the Control Panel's brightness had strained Bates's own eyes as well, by his own account (Paragraph 16 above).

24. Bates also told Plaintiff, in that same meeting, that Bates's plan was to inform Nomad's remaining staff that Plaintiff had been terminated for underperformance, in order to "increase output from the team."

25. The three performance failures described in Paragraph 22 above—and which Defendant's EEOC Position Statement identifies as the basis for termination—are the same three failures already rebutted, with the same citations, in the filed Rebuttal Brief's evidentiary matrix ("EEOC Charging Party's Response to Respondent's Position Statement", Section IV, "Refuting Operational Pretexts"): "Failed Ignition Rollout" (Exhibit P), "TierPoint Outage Negligence" (Exhibit H), and "8-Week Engineering Backlog" (Exhibit Q, Exhibit R). During the termination meeting itself, Bates abandoned this framing in real time once Plaintiff identified that the specific tasks Bates attributed to him on each project had actually been assigned to Nomad's Directors, not to Plaintiff, and offered the different explanation set out in Paragraph 23 above—meaning Defendant's own President dropped these claims face-to-face before Defendant's counsel later revived them, unchanged, as the sole basis for termination.

26. In a separately recorded July 14, 2025 meeting, attended by Bates, Director of Engineering Robert Turner, and Plaintiff, Bates described an established pattern at Nomad in which, when developers encountered an obstacle, "those first people they run to are us"—naming Plaintiff,

Bates himself, and Turner. Illustrating the point by mimicking what he described as a typical developer's reaction, Bates stated, "It's like, oh, I can't get my work done? That's OK. Brit can do it. Mike can do it. Robert can do it" (Exhibit N)—Bates's own contemporaneous account identifying Plaintiff as the first person Nomad's developers turned to when stuck. In that same meeting, Bates separately described a two-month delay on a project assigned to two engineers that, once Bates supplied the missing technical specifications himself, was completed in 92 minutes (Exhibit N)—Bates's own contemporaneous account attributing an engineering delay to his own undocumented specifications, consistent with Director Hartshorn's account of the engineering backlog described in Paragraph 22 above. Later in that same meeting, after Bates stated that, compared to the period before predecessor president Torre Tribout's departure, Nomad was "better," "not as scary anymore," and that he would "take this any day over the old days," Turner stated, unprompted, that he was "really stressed out... all the time now" (Exhibit N). When Bates responded, "Are you?," Turner's description moderated to agreeing only that he felt "busy": "I don't know about stressed out, but it's just... Always, always busy" (Exhibit N).

27. In that same July 14, 2025 meeting, Bates described an earlier incident in which an engineering employee's manager—the company's then-President, Torre Tribout—had initially declined to terminate the engineer, stating the employee could be turned around. Bates recounted Owner Robert O'Brien's response, overriding that decision: "...If you fucking think for a second you can turn this guy around, you need to go back in that room and fire him" (Exhibit N). Per Bates, the employee was terminated within two weeks, based on his failure to appear compliant rather than any documented performance deficiency—the same pattern, absence of documented performance criteria preceding a personally directed termination, reflected in Plaintiff's own termination as alleged above.

28. At that same week's L10 leadership meeting on July 14, 2025, attended by Bates, Owner Robert F. O'Brien, Lindsey Luczkowski, Tyler Grew, Robert Turner, Tina Hartshorn, and Plaintiff, Grew relayed to the group a client's view of Bates: "I think he believes you're George Washington, right Mike?" Bates responded, "That's what he says." Grew continued, "Michael's like George Washington, he cannot tell a lie when he's lying." Luczkowski responded, "I mean, that's a talent." Hartshorn added, "He [Bates] knows that he's got a very good talent on spinning it, so." No one present, including Owner Robert F. O'Brien, disputed the characterization of Bates. (Exhibit M).

29. On April 5, 2016, Plaintiff emailed Andy Toennies—a developer who had written approximately 80% of Defendant's eCommerce platform—summarizing a Slack conversation from the preceding day with then-Director of Engineering Dave Davis (Exhibit K). That conversation records that Tribout's calendar showed a meeting titled "coffee with mike" the morning Toennies was terminated by phone, which Davis understood to be a reference to Michael Pollock, O'Brien's representative; that Tribout offered Toennies ongoing contract work at the time of termination; and that Tribout separately told Davis he did not intend to honor that offer, consistent with a similar arrangement Tribout had offered Dallas Beek, another departing developer, several months earlier.

30. Defendant's EEOC Position Statement, submitted June 4, 2026, states that the meeting described in Paragraphs 21–25 "was cordial, and the conversation remained professional throughout." The meeting ran 89 minutes, from 8:37 a.m. to 10:06 a.m., independently verified by Google Location History data. The meeting was held at a public café rather than through the video-call format Defendant otherwise used for business meetings (see Paragraph 21). The content Defendant attributes to the meeting is set out in Paragraphs 22–24 above.

31. At 12:23 p.m. that day, Bates requested Plaintiff's personal email to send a severance package. At 12:26 p.m., Plaintiff sent his email along with a text to Bates stating, "Please record the team meeting and make them turn on their cameras, no dim lights. I want to see those facial responses."—a reference to the dim-lighting comment Bates had relayed from O'Brien earlier that same day, as described in Paragraph 23 above. Bates replied, "Lmao yeah will do bro," without disputing that dim lighting had been a factor in the decision.

32. Defendant's Position Statement further asserts that, in text messages exchanged with Bates following the termination meeting, Plaintiff "acknowledged that his termination was due to poor performance," and that Plaintiff "never raised any claim of discrimination" in those messages—in conflict with the text message described in Paragraph 31 above. The text exchange contains no statement by Plaintiff accepting poor performance as the reason for his own termination. The only reference to "underperforming" in their entire text message history is Plaintiff's statement, "My fear is they will burn out like me and get canned at the first mention of them underperforming," made while expressing concern for his former team. That statement came immediately after Plaintiff told Bates, "I actually feel great. A massive weight has been lifted," adding that he nonetheless thought of his former team and considered them "those poor fuckers," to which Bates responded, "The team is going to suffer but maybe they can step up in a big way"—the statement Plaintiff's "underperforming" remark directly answered, consistent with what Bates had separately told Plaintiff in the termination meeting earlier that same morning, described in Paragraph 24 above, regarding Nomad's intent to attribute Plaintiff's termination to underperformance in order to motivate the remaining staff. The same exchange contains no statement by Plaintiff or Defendant describing any actual performance deficiency of the Plaintiff.

33. Later that same day, before Nomad's company-wide meeting had occurred, Plaintiff told Director Tina Hartshorn by text that he expected the message to staff would be "that anyone can be fired for performance at any time, including Michael [Bates]"—a prediction based on what Bates had told Plaintiff in the meeting described in Paragraph 24 above. Hartshorn confirmed after the company-wide meeting that "that's exactly what was said," and that "it was the message." Implementation Engineer Hector Wong separately reported that, at the same company-wide meeting, Bates told staff "everyone is replaceable, including me," and framed Plaintiff's termination around "raising the bar," stating that "effort alone is not enough, we need results." Hartshorn separately confirmed that staff were required to keep their cameras on throughout the all-hands—a requirement Plaintiff understood to be unusual at Nomad, where cameras were otherwise required only during the L10 meetings Owner Robert O'Brien attended—texting Plaintiff, "That meeting was a shocked one for sure n we had to have our cameras on," consistent with Plaintiff's own request to Bates that same morning, described in Paragraph 31 above, that the meeting be conducted with cameras on and without dimmed lighting. When Plaintiff observed that the message was a "mixed message" given that he had "been putting in more hours than anyone," Hartshorn responded, "[L]ol right[?] - [you] put in tons of hours, hard work, [and we] can always count on [you] - [I] can't wait for my walking papers." Separately, at 3:13 p.m. that same day, Implementation Engineer Hector Wong, responding to Plaintiff's question whether Defendant had "found another me to fill that role," told Plaintiff, "[No,] they didn't. [Y]our role is being split between Tina and Michael now"—meaning Hartshorn and Bates himself. Defendant has offered no restructuring rationale, in any filing, for reassigning Plaintiff's Vice President duties across Tina Hartshorn—promoted to Vice President upon Plaintiff's termination —and Defendant's own President. Requiring two employees to complete the output of one

terminated employee directly contradicts Defendant's claim that Plaintiff was "severely deficient" in the Vice President role.

34. Hartshorn and Wong also separately reported, consistent with Plaintiff's own account, that Bates told staff the termination decision itself was not his: Hartshorn stated Bates told the team "Bob [Robert F. O'Brien] is the one that requested this"; Wong stated Bates told the team the termination "wasn't his choice," while separately "claim[ing] full responsibility" for Plaintiff's situation. Wong's account does not specify what Bates meant by "full responsibility." The only specific reasons Bates had given Plaintiff for the decision—the three project failures described in Paragraph 22 above—are each independently contradicted by the contemporaneous recordings and messages described in that same paragraph.

35. On October 20, 2025, the day of Plaintiff's termination, incoming Vice President Tina Hartshorn texted Plaintiff, "I am not even close to what [you] know and did for this place." Hartshorn separately texted, "we lost a major part of the company [and] we won't be able to get it back," and, in the same exchange, "I think this was a stupid move."

36. That same day, Implementation Engineer Hector Wong texted Plaintiff that he "believe[d] this was a major misstep," and separately texted, "The company was being pushed from every direction. At least from where I'm standing, we would be in the same situation regardless of who was in the captain's seat." Wong also texted that Defendant's stated goal of "higher output with less errors" was "[n]ot really doable, and certainly not sustainable," and that Defendant was trying "every play in the book except not being understaffed."

37. Hours after the termination meeting, Bates texted Plaintiff that, without Plaintiff, operations would become "a shit show this week for sure. And probably every week," and separately stated that the team would suffer, as described in Paragraph 32 above. That same day, Bates also

offered Plaintiff a paid consulting role—independently corroborated when Director Tina Hartshorn, unprompted, asked Plaintiff directly, "Did Michael offer doing consulting work?" The following day, October 21, 2025, Bates personally negotiated the terms of Plaintiff's severance agreement before Plaintiff ever saw the document, telling Plaintiff by text, "it seems like what I negotiated so I signed it."

38. The same day, two more colleagues independently sent Plaintiff similar messages. Project Manager Karla Mink texted, "I am happy you will be able to live life and not be stuck working all the time. You are extremely missed. Thank you for taking time to teach me. Your support was a rock that helped us through some challenging situations." Aaron Lizotte texted, "every single person on this team feels like we just lost a pillar... I appreciate literally everything you have done for me since the beginning."

39. On October 21, 2025—the day after termination—Bates executed a Separation Agreement on Defendant's behalf that contractually guaranteed Plaintiff a positive professional reference regarding his "performance and contributions." The agreement raised no performance concerns. The same agreement provided that any violation of its non-disparagement terms, "as determined by the Company in its sole discretion," would result in forfeiture of any remaining severance payments, and separately provided that a breach of its confidentiality terms would automatically void the agreement and require Plaintiff to "immediately return all sums paid to" him. Plaintiff never signed the agreement, and no severance was ever paid to him under it.

40. On October 31, 2025, Plaintiff sent Bates a written response to the severance offer by email, stating that his hope was for a transition package that would "establish a fair exit in line with industry practice," and describing himself as having been "recognized by colleagues and leadership as a 'pillar' and key contributor to the company's growth" over his 17-year tenure.

Bates's reply, sent fourteen minutes later, raised no performance-related concerns and did not dispute Plaintiff's description of his own tenure; it asked only which specific terms Plaintiff wanted changed.

41. Defendant's EEOC Position Statement characterizes this same correspondence as showing that Plaintiff's messages "focused on severance and what he characterized as 'industry standards' for separation packages," offered in support of Defendant's broader assertion that Plaintiff's own communications confirm he understood his termination was performance-based. The October 31 email contains no acknowledgment of poor performance; to the contrary, it affirmatively describes Plaintiff as a "pillar" and key contributor, and Bates's immediate reply did not dispute that description or raise any performance concern of his own.

42. Defendant's Position Statement frames Plaintiff's argument that the Separation Agreement's reference guarantee and the post-termination consulting offer are evidence of pretext as something Plaintiff merely "contends," asserting that "neither the reference provision in the Separation Agreement nor a consulting offer establishes pretext" and that both are simply "common provisions in executive severance agreements." Plaintiff had raised the consulting-offer argument in writing to Defendant's outside counsel on April 15, 2026, and the reference-provision argument in his EEOC Charge of Discrimination, filed April 17, 2026—the same Charge to which the Position Statement responds. Both arguments were therefore in Defendant's possession, in writing, for more than six weeks before the June 4, 2026 Position Statement was filed; Defendant's response does not engage with either beyond the conclusory assertion that neither "establishes pretext."

43. In connection with his promotion to Vice President, Plaintiff was verbally promised, by President Bates, a base salary of $170,000 and two salary increases of 5–8% scheduled at the 90-

day (April 16, 2025) and 180-day (July 16, 2025) milestones, tied to Plaintiff's completion of his EOS quarterly performance goals. Plaintiff recorded both milestone dates on his Nomad Google Workspace calendar, marking each entry "Private"—the same privacy setting Plaintiff used elsewhere specifically to shield compensation-related information, and distinct from the VA-appointment calendar entries described in Paragraph 5 above, which he left unmarked. Plaintiff met the performance goals tied to both milestones, and neither raise was ever paid. On September 11, 2025, after Plaintiff inquired about the overdue raises, Bates told Plaintiff he would raise the matter with Owner Robert O'Brien and follow up before October 1, 2025. October 1, 2025 passed with no further communication from Bates on the subject, and Plaintiff was terminated nineteen days later.

44. Bates's reduced availability, described in Paragraph 10 above, was connected to the medical crisis described in Paragraph 5 above. Bates's own calendar records a flight to Las Vegas on Monday, September 15, 2025, and a 9:00—9:30 a.m. "Nomad Financials" meeting on Thursday, September 18, 2025—the same day as the crisis described in Paragraph 5 above—whose participants included Owner Robert O'Brien's two adult sons, Connor O'Brien and Ted O'Brien, together with Bates and O'Brien Capital Executive Business Partner Lindsey Luczkowski, the first documented instance of either of O'Brien's sons participating directly in a Nomad business meeting. Bates's calendar records his return flight to St. Louis later that same day. That night, in the same September 18, 2025 text exchange described in Paragraph 5 above, Bates told Plaintiff, "I only get 5," explaining that he therefore had "5 chances to not destroy an entire flight," and thanked Plaintiff: "Thanks for talking with me earlier... It was helpful." Bates's reduced availability, described in Paragraph 10 above, continued through the majority of the two weeks following September 18, 2025—a window that included his October 1, 2025 follow-up deadline

on Plaintiff's overdue raises, described in Paragraph 43 above, which passed without further communication.

45. Forty-three days after termination, on December 2, 2025, Defendant's outside counsel sent the first written assertion—in a letter to Plaintiff's then-counsel—that Plaintiff's performance had been "severely deficient." This was the first documented performance criticism in Plaintiff's entire 17-year tenure, and it directly contradicted the Separation Agreement signed 43 days earlier, as well as Bates's own non-response described in Paragraph 40 above. For much of his ten months as Vice President, Plaintiff performed the duties of multiple roles simultaneously—including the dual Vice President/Lead Front-End Engineer workload described in Paragraph 2 above and the additional duties he assumed during Bates's reduced availability described in Paragraph 10 above—a workload inconsistent with the letter's characterization of his performance as deficient. The same letter separately asserted that "Nomad never promised Mr. Finnegan specific compensation tied to any specific performance metric."

46. Defendant's own statements elsewhere directly contradict the December 2, 2025 letter's "severely deficient" characterization of Plaintiff's performance. Bates had stated that Nomad's operations would become "a shit show this week for sure... And probably every week" without Plaintiff and that "the team is going to suffer" (Paragraph 37 above), and, on September 12, 2025, that ownership viewed Bates and Plaintiff as "very effective leaders... that's why we get all the rocks done" (Paragraph 10 above).

47. The December 2, 2025 letter also contradicted Defendant's own written bonus plan, which states that Plaintiff's role paid "1% of total subscription revenue for every $500,000 of recurring revenue achieved," with specific stated milestones of "$25,000 at $2,500,000, $30,000 at $3,000,000" in annual recurring revenue—a plan under which Defendant paid Plaintiff the

$25,000 milestone bonus in May 2025, three weeks before Bates's own September 26, 2025 statement, described in Paragraph 10 above, that the company was on track to reach the next, $3,000,000 milestone "this year."

48. The same December 2, 2025 letter also stated that Nomad "is currently unprofitable," and that "the majority of Nomad's growth has been the result of sales and marketing efforts outside Mr. Finnegan's reporting line"—an admission, from Defendant's own counsel, that the sales and marketing functions credited with Nomad's growth sat outside Plaintiff's own area of responsibility. Defendant's June 4, 2026 Position Statement, six months later, does not repeat the "currently unprofitable" claim.

49. The December 2, 2025 letter separately denied Plaintiff's account that Bates had attributed part of the termination decision to Plaintiff's dim lighting, stating that "these allegations are false." Bates's own contemporaneous text message, described in Paragraph 31 above, did not dispute that account when Plaintiff referenced it the same day as the termination, and Defendant's June 4, 2026 Position Statement, six months after this flat denial, does not repeat it —it does not address the dim-lighting statement at all, describing the termination meeting only as "cordial" (Paragraph 30 above).

50. The same December 2, 2025 letter also stated that "[a]t no point did Mr. Finnegan disclose he was struggling with depression"—in the context of describing a different, later conversation, approximately one week before termination, in which Plaintiff is alleged to have reported working sixteen hours over the preceding weekend; Nomad's own contemporaneous recording of the meeting this account refers to (Exhibit O, October 13, 2025 L10) in fact shows the opposite —Plaintiff reporting that he had, for the first time in months, not worked through the preceding weekend. Independent of that specific denial, Plaintiff's own account, alleged in Paragraph 5

above, is of a separate, earlier April 15, 2025 in-person conversation in which Plaintiff discussed his combat service, PTSD, and depression directly with Owner Robert O'Brien—a conversation the December 2, 2025 letter does not address.

51. Defendant's personnel records contain no coaching logs, incident reports, or performance improvement plans at any point during Plaintiff's ten months as Vice President, or at any point during his entire 17-year tenure—notwithstanding Defendant's own EEOC Position Statement's assertion, addressed in Paragraph 13 above, that Plaintiff was "repeatedly coached to focus on management and leadership responsibilities." By contrast, Defendant's own records show that August Stobbs—the employee Plaintiff trained as his own replacement in the Lead Front-End Engineer role, as alleged in Paragraph 2 above—was placed on a written performance improvement plan on September 8, 2025. Plaintiff, as Stobbs's second-level manager, was responsible for overseeing the plan, which Director Hartshorn administered day-to-day as Stobbs's direct supervisor. Plaintiff personally sent the document to Hartshorn, Stobbs, and HR Director Whisler for signature through Nomad's electronic-signature platform, and was separately named in the plan itself as one of two resources available to assist Stobbs. That plan scheduled three progress-review meetings—September 23, October 8, and October 23, 2025, the last falling three days after Plaintiff's own termination—and its progress was a standing agenda item at Nomad's leadership meetings, including a September 12, 2025 meeting at which Stobbs's performance was described as "showing improvement" ahead of a "final evaluation scheduled for the 23rd," with Hartshorn and Plaintiff assigned to meet with Stobbs on September 15, 2025 to provide feedback, and a September 29, 2025 meeting, three weeks before Plaintiff's termination, at which the plan's progress was again discussed—notwithstanding that Stobbs had

been employed by Defendant for a small fraction of the time Defendant now says Plaintiff was "severely deficient."

52. Following termination, Plaintiff experienced a clinically documented worsening of his PTSD and depressive symptoms, confirmed by his treating psychologist, Dr. Karen Loaiza, in an April 13, 2026 letter describing an "increase in anxiety and worry, depressive symptoms (transient thoughts of suicide, staying in bed for days, hopelessness, negative beliefs of self), sleep disturbance, and an increase in anger and sense of distrust," together with "a significant decline in his functioning." Dr. Loaiza's letter concludes that "there is a clear nexus of the job termination and exacerbation of mental health issues for Mr. Finnegan."

53. Plaintiff's use of dimmed lighting and noise-cancelling headphones since at least April 30, 2010, as alleged in Paragraph 4 above, constituted the exercise of a reasonable accommodation protected under 42 U.S.C. § 12203(b) — an accommodation Plaintiff was still actively using and discussing as recently as the October 13, 2025 L10 meeting described in Paragraph 16 above. Defendant's termination of Plaintiff's employment seven days later, on October 20, 2025, citing Owner Robert F. O'Brien's hostility toward that accommodation, as alleged in Paragraph 23 above, constituted unlawful interference with, and retaliation for, Plaintiff's exercise of that protected right, in violation of 42 U.S.C. § 12203(a)-(b).

**COUNT II — PIERCING THE CORPORATE VEIL / ALTER EGO LIABILITY**

**(Against Defendant Robert F. O'Brien, Individually, as to Counts I and III)**

54. Plaintiff incorporates by reference paragraphs 1 through 53 above as if fully set forth herein.

55. This Court has supplemental jurisdiction over this claim under 28 U.S.C. § 1367(a), as it arises from the same case or controversy as the federal claim alleged in Count I.

56. Defendant Robert F. O'Brien ("O'Brien") is, upon information and belief, the controlling owner of Nomad eCommerce, Inc. O'Brien serves as Nomad eCommerce, Inc.'s registered agent at 1000 Spyglass Lane, Naples, FL 34102, a seasonal property he and his wife own. O'Brien's own federal campaign-contribution disclosures, spanning 2012 through at least February 2025, list his state of residence as Missouri in every instance; his own Florida voter registration separately lists its mailing address as 121 Linden Ave, Saint Louis, Missouri 63105. O'Brien in fact resides, and spends the majority of his time, at 121 Linden Ave, Saint Louis, Missouri 63105, where he is served in this action.

57. At all times relevant to this action, O'Brien exercised complete domination over the finances, policy, and business practices of Nomad eCommerce, Inc., such that Nomad eCommerce, Inc. had no separate mind, will, or existence of its own with respect to the conduct alleged in this action.

58. 121 Linden Ave, Saint Louis, Missouri—a single-family residence—simultaneously serves as the business address of O'Brien Capital LLC, the registered-agent address of Standfast Properties LLC, and the corporate mailing address of Nomad eCommerce, Inc., all entities controlled by O'Brien. In a July 8, 2025 internal company chat, after an employee raised the concern that the company should not use "Bob's [O'Brien's] home address," President Michael Bates confirmed: "Our legal address is a house in Naples FL, but I'd prefer we don't really use that address for marketing or contact purposes," and that "Bob [O'Brien] has staff that checks his mail."

59. Nomad eCommerce, Inc. did not maintain material business terms, including Plaintiff's own role and compensation, in written form. President Michael Bates stated in a recorded October 10,

2025 meeting: "In typical Michael Bates fashion, nothing was ever put in writing because everything is subject to change."

60. Nomad eCommerce, Inc.'s Florida corporate filings list Edward O'Brien and Connor O'Brien as Vice Presidents and Directors; upon information and belief and based on Plaintiff's 17 years with the company, neither individual was actively involved in the operation of the business.

61. Nomad eCommerce, Inc.'s position in this litigation, including its EEOC Position Statement, is presented entirely through the account of President Michael Bates. Two Nomad employees independently stated that the decision to terminate Plaintiff's employment was directed by O'Brien, not Bates. In a recorded July 10, 2025 marketing meeting, when asked how he would describe Nomad's technology to a prospective client without disclosing it was built on the .NET platform, Bates stated he would "just lie through my fucking teeth," and, when separately asked how he would describe Nomad's artificial intelligence capabilities, stated he would "probably lie to them about some of our AI feature set" and "probably tell them some shit about Gemini."

62. Plaintiff's November 11, 2025 demand letter was addressed to O'Brien individually and identified him as responsible for Plaintiff's termination. Every subsequent written position taken by Nomad eCommerce, Inc.'s counsel—the December 2, 2025 letter and the June 4, 2026 Position Statement—omits any reference to O'Brien by name, notwithstanding the statements described in Paragraph 61 above.

63. A related-party loan exceeding $7,000,000 between O'Brien Capital LLC and Nomad eCommerce, Inc. remained undocumented for an extended period. An O'Brien Capital LLC executive stated on two separate recorded occasions (June 6, 2025, and October 10, 2025) an intention to backdate the loan documentation, with O'Brien's assent.

64. In a recorded June 6, 2025 meeting, Luczkowski described consolidating Nomad eCommerce, Inc.'s outstanding obligations to O'Brien Capital LLC: "this is where we took everybody's loans that were sitting out there and we consolidated it all into O'Brien Capital," describing an increase of approximately $2,500,000 in Nomad eCommerce, Inc.'s liabilities to O'Brien Capital LLC over the preceding eight months, and stating of the consolidation itself: "that's not what has been, you know, common knowledge up until this point."

65. In the July 14, 2025 recorded meeting described in Paragraphs 26–27 above, Bates described Nomad's predecessor president, Torre Tribout, as having used a company credit card for personal expenses as high as $60,000 to $70,000 per month before the card was discontinued, a change Bates estimated improved the company's cash position by approximately $300,000 (Exhibit N). Lindsey Luczkowski and HR Director Becky Whisler are described, in that same meeting, as having discussed the scope of this spending contemporaneously. Luczkowski has served continuously as an O'Brien Capital staffer since August 2011 and, per her own professional profile, personally maintained general ledgers and reconciled more than twenty accounts across O'Brien-controlled entities during the relevant period. Upon information and belief, given that role, O'Brien and Luczkowski were aware of this recurring expenditure for an extended period before the card was discontinued.

66. In June 2025, Nomad eCommerce, Inc.'s registered principal office was changed to 1000 Spyglass Lane, Naples, FL 34102—O'Brien's seasonal residence—in connection with the company's conversion from an Illinois to a Florida corporation. In a recorded September 12, 2025 meeting, Bates stated that, as a result of the Florida reincorporation, departing employees would no longer receive payment for accrued paid time off: "Now in Florida, you don't do that anymore, so you offset that liability." The Separation Agreement presented to Plaintiff on

October 21, 2025 was, by its own terms, governed by the laws of the State of Florida. That same agreement further provided that any violation of its non-disparagement terms, “as determined by the Company in its sole discretion,” would result in forfeiture of any remaining severance payments, and that a breach of its confidentiality terms would automatically void the agreement and require return of all sums paid.

67. The Collier County, Florida Tax Collector's account records for 1000 Spyglass Lane, Naples, FL 34102 (Real Estate Account #17461920000) reflect an active Homestead Exemption on the property.

68. On November 24, 2025—thirteen days after O'Brien received Plaintiff's formal demand letter dated November 11, 2025—O'Brien formed Standfast Properties LLC.

69. On June 12, 2026—eight days after Nomad eCommerce, Inc. submitted its EEOC Position Statement dated June 4, 2026—Standfast TRAM, LLC, a Missouri limited liability company controlled by O'Brien and formed July 10, 2017, registered as a foreign limited liability company in Indiana. That registration lists its principal office at 4809 N. Ravenswood Ave., Unit 315, Chicago, Illinois—the identical address listed as Standfast Properties LLC's own principal office under Paragraph 68 above—and names O'Brien's sons, Edward O'Brien and Robert Connor O'Brien, as governing persons.

70. The Standfast TRAM, LLC Indiana foreign-registration described in Paragraph 69 above lists Lindsey Luczkowski, individually, as Registered Agent at 4223 Wolcott Dr, Plainfield, IN 46168, a filing she personally signed as “Authorized Agent” under Indiana's statutory warning that a knowingly false material statement is a Class A misdemeanor. Luczkowski's actual residence, per the St. Charles County, Missouri Assessor, is located in St. Charles, Missouri, on residential property she has owned jointly with Thomas C. Luczkowski since 2006. No address

matching "4223 Wolcott Dr" appears in the Hendricks County, Indiana property records, and the parcel at that physical location is owned by Saratoga Crossing Apartments Owner LLC, a 15.82-acre apartment complex with no apparent connection to Standfast TRAM, LLC, O'Brien, or Luczkowski.

71. Florida annual reports for Classic Equine Equipment, LLC and Classic Equine Holdings, LLC, two entities controlled by O'Brien, bear an electronic signature under the name of Michael J. Pollock: Classic Equine Equipment, LLC's report was filed April 26, 2021, approximately two months after Mr. Pollock's death on February 20, 2021; Classic Equine Holdings, LLC's reports were filed April 26, 2021, also approximately two months after his death, and again April 22, 2022, approximately fourteen months after his death. O'Brien is listed as registered agent on all three filings. Classic Equine Equipment, LLC's operations were relocated to 1000 Spyglass Lane, Naples, FL in 2013—the same address to which Nomad eCommerce, Inc. relocated its own registered principal office in 2025, as alleged in Paragraph 66 above.

72. An Indiana Business Entity Report for Nomad eCommerce, Inc., naming Michael Bates as President, Secretary, and Treasurer, was filed on October 22, 2025—48 hours after Plaintiff's termination—signed under penalty of perjury by a third-party authorized agent rather than by Bates himself.

73. Bates's own address, 36 Concord Drive, Fairview Heights, IL 62208, appears on three separate official state filings: the 2025 Illinois Annual Report, filed May 29, 2025; the Florida Articles of Incorporation, filed June 13, 2025; and the 2026 Florida Annual Report, filed April 7, 2026. On March 19, 2026, Plaintiff sent Bates a Missouri Service Letter demand by certified mail at that same address. The postal carrier attempted delivery on March 26, 2026. On April 15, 2026—nine days after Nomad's own April 7, 2026 Florida Annual Report re-listed that address

as current—the United States Postal Service returned the letter to Plaintiff, marked "RETURN TO SENDER—VACANT—UNABLE TO FORWARD." Plaintiff received the returned letter on April 18, 2026, and received no response from Bates or Nomad eCommerce, Inc. to that demand.

74. In a separate matter, ORCO Tool, Inc. and O'Brien Capital, LLC—the latter another entity controlled by O'Brien—sued Roger D. Watson and related defendants for breach of contract in ORCO Tool, Inc. and O'Brien Capital, LLC v. Roger D. Watson, et al., Case No. 15SLCC02047 (St. Louis County Circuit Court). O'Brien Capital, LLC placed a double lien against ORCO Tool & Machine, LLC through UCC financing statements covering substantially all of that company's assets. (Watson's own counterclaim in that same litigation alleged breach of fiduciary duty against the plaintiffs; Watson voluntarily dismissed that counterclaim without prejudice on or about January 26, 2017.) Court filings in that matter reflect that O'Brien funded the litigation through a line of credit held by his own entity. The UCC filings were prepared by Stinson LLP (then Stinson Leonard Street), the same law firm that later prepared Nomad eCommerce, Inc.'s 2025 Florida reincorporation filings and that currently serves as Defendant's outside counsel in this matter.

75. In a separate, earlier transaction, O'Brien Capital LLC provided the entire purchase financing for the personal residence of Cameron Baker, a co-founder of Standfast USA, LLC, another entity controlled by O'Brien. Following Mr. Baker's default on that financing, a January 2015 settlement of the default formally named Standfast USA, LLC as a party to the release of Mr. Baker's personal mortgage obligation to O'Brien Capital LLC.

76. Nomad eCommerce, Inc.'s registered principal office, 1000 Spyglass Lane, Naples, FL 34102, is located within the Port Royal subdivision, as confirmed by the property's recorded

deed (Collier County Instrument 4429655) and tax records. Port Royal's recorded deed restrictions limit use of property within the subdivision to single-family residential purposes.

77. ORCO Tool & Machine, LLC and entities within the Standfast family—each controlled by O'Brien—were also Nomad eCommerce, Inc. clients during Plaintiff's tenure, publicly identified as such in Nomad eCommerce, Inc.'s own advertising and website content, with Plaintiff personally performing front-end development work for each of them. Classic Equine Equipment, LLC was also a Nomad eCommerce, Inc. client while under O'Brien's control, before its 2021 sale to Morton Buildings, Inc., described in Paragraph 71 above; Nomad eCommerce, Inc. continued to serve as that company's website vendor after the sale, including a payment-processing matter on the account in June 2025 handled directly between Plaintiff and Director Becky Whisler.

78. On April 16, 2025, Standfast TRAM, LLC's shop manager, Tim Thornton, forwarded a routine Nomad eCommerce, Inc./Amazon Simple Email Service verification notice—triggered by a misconfigured contact-form mail handler a Nomad designer had created on the Standfast TRAM website—to Robert Connor O'Brien, Standfast TRAM, LLC's Vice President and O'Brien's son, with the note: "I was thinking SCAM but then I realized this is Part of the 'Family'... Is this legit for centralizing the Amazon purchased or just 'Advertisement'?" Bates looped Plaintiff and Director of Engineering Robert Turner into the same thread to resolve the issue and separately asked Plaintiff to serve as the Standfast TRAM team's point of contact going forward.

79. A Form D filed with the United States Securities and Exchange Commission on September 27, 2007 by Standfast Enterprises USA, LLC, at 2502 North Clark Street, Suite 207, Chicago, Illinois, identifies Cameron Baker as President and Manager of that entity, together with Brett

Chenoweth, Andrew Boustred, Ian Gillespie, Greg Ritchie, and Trish Preheim as its officers and directors; Robert O'Brien is not named in that filing. A subsequent Form D filed May 24, 2012 by Stand2, LLC, at the same address, names Robert F. O'Brien as Executive Officer and identifies Cameron Baker as a related person, and states, in response to the filing's question whether the offering was made in connection with a business combination transaction, that "Investors were members of a company whose assets were purchased by Stand2, LLC."

80. O'Brien Capital LLC is listed as a creditor in the Chapter 11 bankruptcy of Standfast USA, LLC, Case No. 16-46691 (Bankr. E.D. Mo., filed September 16, 2016), holding approximately 96.6% of the debtor's total liabilities. The debtor's sworn Statement of Financial Affairs discloses no equity security holders, notwithstanding that the same filing's officer disclosure identifies Stand2, LLC, another entity controlled by O'Brien, as the debtor's sole member. In 2017, O'Brien Capital LLC credit-bid $600,000.00 of its claims against the debtor to acquire substantially all of the debtor's assets, satisfying the purchase price by waiving its own unsecured claim, while the debtor's existing equity holders received no distribution. The Asset Purchase Agreement effecting that sale was executed by Robert O'Brien, individually, as Manager on behalf of both the seller, Standfast USA, LLC, and the buyer, Standfast TRAM, LLC.

81. In a separate 2017 transaction, Stand2, LLC—the same entity identified in Paragraph 80 above as Standfast USA, LLC's sole member—sold its intellectual property and general intangibles to Standfast TRAM, LLC for $750,000.00 under an Asset Purchase Agreement dated August 1, 2017, executed by Robert O'Brien, individually, as Manager on behalf of both the buyer, Standfast TRAM, LLC, and the seller, Stand2, LLC. Stand2, LLC's own motion seeking bankruptcy court approval of that sale (Case No. 4:17-bk-45233, Bankr. E.D. Mo., Doc. 14)

stated: "The proposed sale to the Purchaser under the APA is a sale to an insider and cannot, on its face, be deemed to have been negotiated at arm's length."

82. On February 4, 2025, Plaintiff and President Michael Bates were invited to O'Brien's residence at 121 Linden Ave, Saint Louis, Missouri, to discuss that day's leadership planning session, before the three proceeded to dinner with the leadership team at a restaurant near O'Brien's residence. Plaintiff's own contemporaneous location-history record confirms a stop at that address from approximately 5:04 p.m. to 5:53 p.m. that day, immediately followed by travel to the dinner location. Company business was discussed inside O'Brien's residence, with O'Brien personally present.

83. O'Brien Capital LLC's registered office with the Missouri Secretary of State, and its business tax address since at least 2016, is 7700 Forsyth Blvd., Suite 1230, Clayton, Missouri. Public records maintained by the Financial Industry Regulatory Authority ("FINRA") show a FINRA-registered securities representative continuously registered with J.P. Morgan Securities LLC at that same suite since on or about October 25, 2019.

84. The conduct alleged in Paragraphs 57 through 83 constitutes a dishonest and unjust use of O'Brien's control over Nomad eCommerce, Inc. in contravention of Plaintiff's legal rights, including the timing of entity formations and the Florida reincorporation to coincide with Plaintiff's legal claims against, and compensation inquiries directed to, the company O'Brien controls. The backdating of the related-party debt documentation described in Paragraphs 63 and 64 above additionally constitutes a transfer voidable under Missouri's Uniform Fraudulent Transfer Act, RSMo § 428.005 et seq., including the factors enumerated at RSMo § 428.024.2 — among them, a transfer to an insider, the debtor's retention of control over the asset transferred, and timing relative to a threatened or pending claim.

85. As a direct and proximate result of O'Brien's domination and control of Nomad eCommerce, Inc. and his wrongful use of that control — including a related-party debt to O'Brien Capital LLC exceeding $7,000,000, more than double the approximately $3,000,000 in annual recurring revenue Bates projected to leadership for that same year, at a company employing approximately 20 people, as alleged in Paragraph 20 above — Nomad eCommerce, Inc. may be rendered unable to satisfy a judgment in this action, while value and control continue to reside with O'Brien through the entities described above. The same written bonus plan described in Paragraph 47 above separately provided that, at each $500,000 increment in recurring revenue, Directors would each receive 0.5% of total subscription revenue ("$12,500 at $2,500,000, $15,000 at $3,000,000") and each eligible non-leadership employee would receive a flat $5,000, in addition to the Vice President's 1% tier described in Paragraph 47 above. At the May 2025, $2,500,000 milestone, this schedule obligated Nomad eCommerce, Inc. to pay a combined total of at least $137,500 across the Vice President, five Directors, and ten eligible non-leadership employees — a recurring cash obligation incurred at the same time the company's undocumented, unpaid-down related-party debt to O'Brien Capital LLC, described in Paragraphs 63–64 above, continued to grow.

86. Equity and Missouri law require that the corporate form of Nomad eCommerce, Inc. be disregarded and that O'Brien be held personally and jointly liable, together with Nomad eCommerce, Inc., for any judgment entered in this action.

**COUNT III — MISSOURI WHISTLEBLOWER PROTECTION ACT, RSMo § 285.575**

**(Against Defendant Nomad eCommerce, Inc.)**

87. Plaintiff incorporates by reference paragraphs 1 through 86 above as if fully set forth herein.

88. This Court has supplemental jurisdiction over this claim under 28 U.S.C. § 1367(a), as it arises from the same case or controversy as the federal claim alleged in Count I.

89. At all times relevant to this action, Defendant Nomad eCommerce, Inc. employed six or more employees for each working day in at least twenty calendar weeks of the current or preceding calendar year, and is an "employer" within the meaning of RSMo § 285.575.

90. On October 10, 2025, as alleged in Paragraph 14 above, Plaintiff was present for a recorded accounting meeting in which Lindsey Luczkowski told Bates that a related-party debt exceeding $7,000,000 owed by Nomad eCommerce, Inc. to O'Brien Capital LLC had not yet been documented in writing, and that she intended to backdate that documentation to February 2025, the same month Defendant O'Brien completed his acquisition of control over Nomad eCommerce, Inc.—eight to ten months before the date it would actually be prepared and signed. President Michael Bates responded, "Okay." As alleged in Paragraph 63 above, an O'Brien Capital LLC executive separately stated, on two recorded occasions, an intention to backdate this same loan documentation, with Defendant O'Brien's assent.

91. On October 13, 2025, as alleged in Paragraph 18 above, Plaintiff raised questions with Bates concerning the debt described in Paragraph 90 above, including how the debt reached $7,000,000, when it began, where the funds had gone, and why its documentation was being backdated rather than executed and recorded contemporaneously. Plaintiff's questions concerned the conduct of O'Brien Capital LLC and Defendant O'Brien—the entity and individual responsible for originating, directing, and assenting to the related-party debt and its backdating, as alleged in Paragraph 90 above—and were directed to Bates in his capacity as Plaintiff's immediate manager, not as an accusation that Bates himself had committed the underlying act. The backdating Plaintiff questioned constitutes a transfer voidable under Missouri's Uniform

Fraudulent Transfer Act, RSMo § 428.005 et seq., as alleged in Paragraph 84 above, and therefore concerned an unlawful act of Plaintiff's employer within the meaning of RSMo § 285.575.2(4).

92. Plaintiff's report, described in Paragraphs 90–91 above, concerned a matter outside Plaintiff's own job duties. Nomad eCommerce, Inc.'s own EOS Organizational Chart, dated and printed May 6, 2025, assigns responsibility for accounts receivable and payable, payroll and benefits, financial projections and modeling, and financial reporting to the company's Finance/HR seat, held by Director Becky Whisler—not to Plaintiff's Integrator seat. Although that same chart lists Nomad's five Directors as reporting to Plaintiff, Plaintiff's role did not include authority over the company's financial, accounting, or related-party transaction decisions: Defendant Bates's approval was required for any company expenditure of $1,000 or more, and material business and financial decisions—including the decision to integrate the Ignition billing platform described in Paragraph 22 above, which originated with Defendant O'Brien and an O'Brien Capital LLC executive before being communicated by Bates to Plaintiff and Nomad's Directors —originated with Defendant O'Brien and Bates rather than Plaintiff. Defendant's own outside counsel separately admitted, in the December 2, 2025 letter described in Paragraph 48 above, that "the majority of Nomad's growth has been the result of sales and marketing efforts outside Mr. Finnegan's reporting line"—an admission, from the party now defending this termination, that the sales and marketing functions it credits with Nomad's growth sat outside Plaintiff's own reporting line, consistent with the EOS Organizational Chart's assignment of Sales duties to a different seat. On the one occasion Plaintiff met with Whisler outside Bates's presence to discuss company finances—a brief review of figures on September 19, 2025, held primarily to inform

Whisler of Bates's hospitalization the preceding day—the discussion did not extend beyond a cursory check of existing figures already within Whisler's own responsibility.

93. At no point before or after Plaintiff's termination did Defendant cite Plaintiff's October 13, 2025 questions about the related-party debt, described above, as a basis for the administrative leave imposed days later or for the termination itself, as alleged in Paragraph 20 above.

94. Plaintiff was terminated seven days after making the report described in Paragraphs 90–92 above, on October 20, 2025, as alleged in Paragraphs 19 and 21–25 above.

95. Defendant discharged Plaintiff because Plaintiff engaged in the protected activity described in Paragraphs 90–92 above, and that protected activity was a motivating factor in Defendant's decision to discharge Plaintiff, within the meaning of RSMo § 285.575.2(1) and (5), in violation of RSMo § 285.575.4.

96. Forty-three days after termination, Defendant's outside counsel sent the December 2, 2025 letter described in Paragraphs 49–50 above, denying Plaintiff's account of the dim-lighting statement and of Plaintiff's April 15, 2025 disclosure of his depression to Owner Robert O'Brien. Those denials followed Bates's own September 18, 2025 disclosure of his psychiatric medication history to Plaintiff, described in Paragraph 5 above, which gave Bates personal knowledge of Plaintiff's own treatment for the same underlying condition before the December 2, 2025 letter was sent. Plaintiff's own email records show that, following a July 15, 2025 appointment, Plaintiff's next contact with his treating psychologist, Dr. Karen Loaiza, was a December 8, 2025 email initiating a new appointment—six days after the December 2, 2025 letter—to which Dr. Loaiza responded the same day; Plaintiff's treatment with Dr. Loaiza then resumed on a regular, recurring basis beginning December 9, 2025 and continuing through at least April 2026 (Exhibit

J). The decline in Plaintiff's psychological functioning documented by Dr. Loaiza, described in Paragraph 52 above, covers this same period.

97. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered actual damages, including lost wages and benefits, and medical expenses directly related to the violation. Upon the facts alleged above—including Defendant's shifting and undisclosed justifications for termination, the timing of the termination relative to Plaintiff's report, and the post-termination conduct described in Paragraph 96 above—Defendant's conduct was outrageous because of its evil motive or reckless indifference to Plaintiff's rights, entitling Plaintiff to liquidated damages under RSMo § 285.575.7.

**IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES**

- EEOC Charge No. 560-2026-02476, filed with the St. Louis District Office.
- Notice of Right to Sue issued August 21, 2026.
- This Complaint is timely filed within 90 days of receipt of that Notice (deadline: November 19, 2026).
- Count III (RSMo § 285.575) does not require EEOC exhaustion; it is pled here under the Court's supplemental jurisdiction, as described in Section II above.

**V. RELIEF REQUESTED**

As to Count I, Plaintiff requests back pay and lost benefits; front pay in lieu of reinstatement—reinstatement being impracticable given Defendants' conduct, and front pay reflecting that the same conduct has impaired Plaintiff's capacity for continued employment in a conventional employer-employee relationship; compensatory damages for emotional distress; punitive damages; pre- and post-judgment interest; costs; and such other relief as the Court deems just and proper.

As to Count II, Plaintiff requests that the Court disregard the corporate form of Nomad eCommerce, Inc., hold Defendant Robert F. O'Brien personally liable, jointly and severally with Nomad eCommerce, Inc., for any judgment entered in this action, and grant such other relief as the Court deems just and proper.

As to Count III, Plaintiff requests back pay, reimbursement of related medical expenses, liquidated damages, costs, reasonable attorney fees, and such other relief as the Court deems just and proper.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor on all three counts, and grant the relief requested above.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable. RSMo § 285.575.6 separately confirms a jury trial is available on Count III, so this single demand covers all three counts.

Respectfully submitted,

Brit Finnegan

Brit Finnegan, Plaintiff, Pro Se
5445 Reber Pl
Saint Louis, MO 63139
618.410.9201
brit.finnegan@gmail.com
Date: 11/19/2026